Appreciates that. Thank you, Your Honor. It's a pleasure. You may proceed. May it please the court, my name is Mike Goodwin. I have the honor of representing Tanya Johnson-Hyles in this case. On behalf of Ms. Johnson-Hyles, we urge the court to overturn the district court's decision to deny her 2255 motion without an evidentiary hearing. I think there are two grounds here the court could reverse this district court's ruling. The first is that Ms. Johnson-Hyles was denied effective assistance of counsel when her trial counsel told her that he had reached a non-prosecution agreement with the government which provided that if she testified at the grand jury and continued to answer questions by the government she would not be prosecuted. The charges against her would be dismissed and she would be immune down the road. She wouldn't be able to be prosecuted for that. The trial counsel told her you need to go in, testify against your husband at the grand jury, continue to answer questions from the agents of the government, be available at the trial of her husband, his co-defendant, and that then all the charges would be dismissed and she would be immune. She did those things. Now wait, counsel. She's indicted just weeks after the grand jury testimony, am I right? The grand jury testimony was in October of 2001. Her trial date, her initial trial date was scheduled to be the following week. So she goes into the grand jury to testify the week prior to her scheduled trial and she tells the grand jury a lot of extremely damning evidence. She says she was aware that her husband had asked her to bond this individual out of jail. He later tells her the reason he was having her bond him out of jail was so that he could murder this witness against him in a state court action. She tells the grand jury that she went and got the firearm and provided it to an individual who eventually was the killer and killed this individual. So she provides a plethora of information at the grand jury, the week before her scheduled trial date. And then as soon as she does that, the government moves for the dismissal of her trial date. And she had previously met with the government agents, I think on four separate occasions. She then again meets with them in December of that year and then doesn't really hear anything from the government for quite some time. In fact, from 2001 to 2005 her counsel says, well I didn't know whether I was supposed to keep this case open or closed. Eventually in 2005, according to Ms. Johnson-Hiles' trial counsel, he receives a letter that says we would like for Ms. Johnson-Hiles to fly up to St. Louis. She was living in Georgia at the time. Meet with us in preparation for trial against her husband. And according to her trial counsel, he tells her I can't go. In fact, he tells her that he has a family obligation but in his motion later for specific performance on this agreement, this non-prosecution agreement, he tells the court, trial counsel tells the court, that it was at the insistence and the request of the Ms. Johnson-Hiles and the government agents. So she flies up and according to the government, gives statements that are not completely consistent, that she does a bit of crawfishing, I think they would say and they then subsequently indict her five years after or four years after the initial As of then, she can no longer have any reasonable belief that there's an agreement, right? So we look at what's harmful to her in terms of prejudice, but what happened before then? Are you really saying it's her grand jury testimony that is really harmful to her? I believe so. She believes throughout this time she's cooperating that she has an agreement. I'm going to prejudice. I'm kind of assuming you're right about everything and now we're just looking at, did it really hurt her? Did it really prejudice her? And I think you're relying on the grand jury testimony. Absolutely. That's the most prejudicial by far. So tell me the most prejudicial item from her grand jury testimony that was used against her. The most prejudicial item, it would be, she essentially went to the grand jury and said, I had the mens rea for this crime. That ends up getting her a life sentence. No, she didn't use the term mens rea. No, she doesn't use it. What she tells the grand jury is she tells them that her boyfriend had her bond this individual out of jail and that's favorable to her. That's not prejudicial, right? Well, she's bonding out the individual to try to go and kill this witness. Now, wait, I thought she testified that Tyrese, if I have his name right, did not tell her why he wanted to bond. I thought that was her grand jury testimony. Initially he did not, but subsequently he did. And he told me that the reason that he was doing it was to kill this individual. And when that statement comes in, it not only does it corroborate, but it also corroborates the key government witnesses at the trial against her. What was her participation after that? Was it after she knew that that's why he was out? Because that doesn't affect her getting him out. Was it after that that her participation in getting a gun and giving the gun to the murderer? Yes. She goes and gets, because initially she bonds this individual out of the jail. That individual does not become the killer. He, I guess in the government's case, he gets cold feet. He doesn't do it. And then she gets the same gun and she provides this gun to the subsequent individual who does kill her. By now she knows from her husband why she's doing that act? Certainly. Now, what's the timing? When did she say that her lawyer told her that there was some sort of an agreement, non-prosecution agreement? Well, initially the lawyer tells her that there's just the proffer letter. And she knows about that. And there's signed proffer letters that are typical of criminal cases, I think. But then prior to the grand jury testimony, she gets this non-prosecution. She's told if you testify in the grand jury and you continue to answer their questions, the case will be dismissed. They won't prosecute you. And that's the only way that would make sense. Because otherwise... The lawyer agrees with that, right? The lawyer confirms that, right? He confirms he told her that? He does in his motion for specific performance. He says there was this second agreement. Not a proffer agreement. This second agreement that was the non-prosecution agreement and that all these subsequent statements were made with this non-prosecution agreement in mind. And the court says, the government says there was no second agreement. Of course, he didn't have it reduced to writing, which would be fundamental in a situation like this, especially if an individual who's facing a life imprisonment is going in front of the grand jury, without the proffer agreement protections. The proffer agreement would protect most of these statements along the way. But it wouldn't protect her when she goes under oath in front of the grand jury. So that's why it would certainly be necessary. And a prudent lawyer would reduce that to writing prior to having her go into the grand jury. But he doesn't do that. And he says it was an oral agreement. Although I point out for the court I think it's 11th Circuit Case Thompson, which says certainly it's almost impossible for courts to interpret these oral immunity agreements. You're wise to have me finish. My point is just timing. So before she went into the grand jury, you say there's evidence here that she says, or maybe confirmed by her lawyer, that there was talk about some sort of separate agreement that she would not be prosecuted if she testified at the grand jury. She says that before the testimony. Correct. And then her lawyer files the motion for specific performance. Then they have an evidentiary hearing. And then after the evidentiary hearing the lawyer also files a memorandum in support. And I don't want to mislead the court that he specifically says this is the date of the agreement. Because that's not true. He never pinpoints it, unfortunately, for everyone. But certainly it would be logical that that's why someone would go into a grand jury and testify. And that's consistent with what she says. Well, isn't a big part of the problem, though, is even assuming all that, and even assuming that performance is deficient, getting back to Judge Benton's question, she lied in front of the grand jury, right? Well, any non-prosecution is going to be dependent upon him. Even assuming there is a non-prosecution, even assuming there is an agreement, it's going to be on the assumption that she gives truthful, useful testimony, right? And complete. I certainly understand the logic of that position. That's the position the court below took. And I'm sure that's, well, the government would probably say whichever statement they wanted to point to, they can point out some inconsistencies or what they would call lies from Ms. Johnson-Hiles. However, they had that information, and they then dismissed the case the following week, so there wasn't any doubt at the time. And then she meets again, and perhaps it's not an absolute defense to Your Honor's question, but when she meets the subsequent time, four years later in St. Louis, she goes without counsel, who certainly her counsel would want to prepare her and say, look, let's go over what you testified previously and explain the importance of being truthful at this point, all those things. That doesn't happen. Counsel's not there. So while I can't defend all of her statements as true, certainly there are some that are inconsistent, I think counsel's deficient performance certainly contributed to that, the problems here. I mean, but to the extent there was an agreement, and, you know, and I think everybody agrees it sounds very fishy you would have an oral agreement, but the lawyer said he had one, and so let's take him at his word. It's going to be dependent upon truthful, useful testimony and her ability to testify at her husband's trial. The government didn't get any of that, did they? I believe they did. They certainly used information against her and thought that was truthful. So the core evidence I knew about, I got this done. She testified at her husband's trial, though, did she? No. They elected not to have her called as a witness. But noticeably lacking from trial counsel's motion for specific performance and her, and Ms. Johnson-Howell's affidavit is any indication, although it's logical, there's no indication there that every one of these questions has to be truthful. There's not that the answers have to be truthful. There's not that explicit requirement like there is in the proffer agreements. Well, that's the problem when you don't have an agreement. What were the terms? Absolutely. So what Judge Molloy's asking you, from a lot of experience, is this what's in these agreements? So we I can't imagine there'd be an agreement for non-prosecution if the government would say, oh yeah, you go ahead and say whatever you want and we won't prosecute you. That would be really typical. I would agree that a reasonable attorney would never advise his client to not tell the truth when you're being questioned by the agents. In fact, you would advise them that it's against the law to do so. However, according to trial counsel's memo, and to Ms. Hiles, the only thing she was told was you have to keep on answering their questions and they can't prosecute you. That's the belief that she had, and that's what's key to her situation. It's not whether the, we're not interpreting the contract, but rather, unfortunately what she was told by counsel that wasn't reduced to revising. Is she saying that her counsel told her it was a non-prosecution and you don't have to tell the truth? She's saying that he told me there was a non-prosecution agreement and all I have to do is keep on answering their questions. That's what she says and that's what he says. I have to be truthful? That's what he says. I know. I'm not defending that action of counsel. But she got, well, I don't want to beat a dead horse, but she did get in front of the grand jury, I presume, and raised her right hand and swore to tell the truth. So even if he hadn't ordered her to tell the truth, she promised to tell the truth. Absolutely. And we think she did. They may point out that she didn't or think that she didn't, but we think she did. I'll reserve the remainder of my time. One other thing that the district court talked about was that she maintained her innocence, and this goes to the prejudice again, that she essentially wasn't, I guess what the district court is saying is she wasn't innocent and yet she still maintained her innocence and so the non-prosecution agreement was never going to be able to be processed because she was continuing to say she was innocent. I think the real point that the court below pointed that out was in regards to the second claim, which is that she had, whether she received competent advice regarding the guilty plea, and they say even if he would have told her you ought to take this and look your exposure is life, they're offering you six years, they have a strong case, even if he would have told her that, she wouldn't have pled guilty because she came to court and she said I'm innocent, she pled not guilty, she insisted on going to trial, etc., etc., and I would urge this court, I couldn't find anything from this circuit, but I would urge this court to follow the logic of the Sixth Circuit in Griffin or the Leilani case out of the Eleventh Circuit in which they say that repeated declarations of innocence don't prove that a defendant would not have accepted a plea bargain. In fact, a defendant often comes to court and maintains their innocence and until they are faced with the odds at trial, the risk of going to trial, do we get this 95% plea rate in federal court? Thank you, Your Honors. Good morning, Mr. Stevens. Chief Judge Riley, members of the court, my name is Christian Stevens, I've had the privilege of being here on behalf of the United States, and I'll just touch on that second issue just very briefly and then I would like to move on to the first issue that the court discussed for most of Mr. Goodwin's time. The cases that Mr. Goodwin just cited are entirely contrary to Eighth Circuit law. I've cited Anglin and Stevens and Sanders in my brief, those are contrary to the Sixth Circuit decision in Griffin, and so I would ask the court obviously to follow its own precedent. In fact, it's obviously required to do so. Griffin is an outlier, even the Sixth Circuit applies that unevenly and in some cases not at all. Now, regarding, how long If a defendant doesn't take a plea agreement, does that mean they're forever foreclosed from filing a 2255? No, no, I don't think that's the case, Judge. If you don't take a plea agreement, you're going to go to trial, right? Certainly, but it's not just this defendant, and the argument they make is that this defendant was just protecting her rights, as was her lawyer, in going to trial, in moving for judgment of acquittal, etc. But we have more than that here, and this court has said clearly that these things, we look at the record, we don't just rely on a defendant's post hoc, self-serving representation that if only, but for my counsel's advice, I would have pled. I was ready to plead, and he advised me not to, and we went to trial and I lost, but if only I had better advice. But what we have here is not just going to trial, not just moving for judgment of acquittal repeatedly, not just objecting to all the facts in the PSR that were proved at trial, not just a post-trial motion denying all the facts, but her statement at sentencing, for example, where she insisted that she was innocent, that she was being sentenced, quote-unquote, for nothing. And that's very similar to in Stevens, the court denied a very similar claim by a defendant who had testified at a post-trial hearing and maintained his innocence. And that's essentially what Ms. Hiles did, when given the opportunity at sentencing, she maintained her innocence. And so that's what we have here, and I think under this clearly, she's not entitled to a hearing on that particular issue. This court requires more than just a defendant's post-hoc statement saying I really wanted to plead guilty, but my lawyer told me not to. Now, on the first issue, the facts, with all due respect to Mr. Goodwin, the facts that he's informed the court of today about the timing of when this supposed second agreement happened, about whether or not Ms. Hiles had to continue to be truthful, I don't know where those come from. We had two hearings in front of the district court in 2005 on this exact issue. There's no evidence in the record of any second agreement, and I'd point out that Judge Benton has already found that on direct appeal. He wrote the direct appeal of this case and affirmed the district court's finding that there was no agreement. There was no evidence of an agreement. That doesn't go into what counsel told the client, what the client believed on the ineffective. That's true, Judge. And that's their point. And we've had no hearing as to test what the counsel says versus what the client says. But we did have two hearings on the issue of whether there was, in fact, an agreement. Yeah, but that was before you could ask the counsel, what'd you really say, and ask the defendant what she really said. Well, I tried to ask Ms. Hiles exactly that, and she invoked the Fifth Amendment. She invoked the Fifth Amendment when I asked her, well, were you... But this was before trial, right? Yes, sir. Yeah, well, see, now trial's over. Yes. And now to 2255, as you know, often different things are said. Right. Yeah. Yes, but that's the thing. There is nothing there... This court has decided, obviously, there was no agreement. So we can start with that premise, obviously. The court has also found that Ms. Hiles did not cooperate, that she was not truthful as required under either the proffer or this supposed second agreement. And, Judge Malloy, you got directly to that point. Those are not my saying that she wasn't cooperative. That's not my saying that she was untruthful. The courts have found that. The district court found it after the magistrate found that in his R&R. This court has found it. And on direct appeal, the district court found it a second time in the 2255. I mean, to me, we almost have to start with the proposition that counsel was deficient. Maybe I'm wrong, but... Because you're right. Everybody agrees now there was no agreement. But he represented to Ms. Hiles in his motion. And we don't know exactly what he said to her. But at least in the motion, he represented that he told her there was an agreement. Well, there's no representation of him ever telling her, Judge. He said there was an agreement. He said he understood there was an agreement. He did. So we can assume... I mean, we didn't have a hearing. This is why you may sometimes need hearings. But I think there's enough here to say that we have to assume that, or at least either that or we have to send him back for a hearing to find out what he did tell her. But let's assume he told her that. And that was deficient. So then you get to the issue, well, where's the prejudice? And I think that's your much stronger argument. Yes, I agree. Although, just briefly, and I don't want to argue the first point. If, for sake of argument, we want to concede that, then that's fine. The government's position is not conceding that, but I understand your point. I would just point out from the very beginning, if you look at defense counsel's pleadings back in 2005 when this supposed non-prosecution agreement first came up, it was shifting sands from the beginning. Initially it was, well, you can infer it from the proffer letter because the proffer letter says, well, we'll negotiate in the future and we may come to some other agreement. Or that, just based on the fact that the indictment ultimately was dismissed, you can infer it. But there's no evidence anywhere of the agreement or his discussion with her about it, even after... Well, we haven't had a hearing, counsel. No, that's true. Gary, you're making an argument for a hearing. No, no. Yeah, I think you're going to make the case for a hearing. So let's talk about prejudice for a second. You're going to talk yourself into a hearing. Yeah, right. You're doing a good job of that. No hearing's required if... Yeah, it is if the client tells one story and the lawyer texts you. We've got several cases on that. Let's go to the prejudice problem. And that's the first point, is that if they're untrue or even if taken as true, it doesn't matter, there's no prejudice, then we don't need a hearing. Okay, now let me ask you a question about that. Your opponent says you take the grand jury testimony and you get the mens rea. You get her knowing of the actual plan and what was going on here, and that's the critical time to connect the dots as to her as the grand jury. Well, the first point is that the agreement didn't exist, but because there's no evidence in the record, what Mr. Goodwin and Ms. Hiles have done in this appeal and in the 2255 is say, well, let's look to the pleadings that defense counsel filed where he claimed that there was a non-prosecution agreement. In those pleadings, he makes very clear that, and he argued at the hearing on the motion for specific performance, Mr. Hill, the previous counsel, that this came about at or about October 24th of 2001. That's one week after the grand jury. And weeks after four different statements. Now, the grand jury's the only one admitted at trial. So if there's any prejudice, that's the prejudice we're talking about. Ms. Hiles could not have relied on any second agreement that was entered into a week after. Now, we pointed that out in our brief. In the reply brief, for the first time, we hear, well, this second agreement was contemporaneous with the grand jury. That's what's in the reply brief. There's nothing to support that, and it's contrary to what is said in the opening brief, what was said in the 2255 motion, and what Mr. Hill's original allegation was. I'll point out in... Well, let me try it on you this way. What is the most damning thing from the grand jury testimony you used? Well, I agree. Well, it's that Ms. Hiles went to Samuel Anderson and obtained the murder weapon, and then transferred it to Mr. Carter. Mr. Carter ultimately didn't get it done, and she brought Mr. Cannon up, and he got the gun. Now, we don't have any evidence in the grand jury testimony that was not proved by other evidence. Nothing. Including that point. And I would point out, when we're talking about the prejudice in this case, the choice was not between the grand jury testimony and nothing. If Ms. Hiles, as they say, would have refused to testify in the grand jury, because if she had known that she didn't have a non-prosecution agreement, which again is impossible, because their own allegation initially, and up until the reply brief, was that agreement came about a week after the grand jury. But the point is, in her very first statement, June 11 of 2001, the date of the proffer letter, clearly everyone agrees that was pursuant to the terms of the proffer letter and no second agreement. She admitted that she obtained the gun from Samuel Anderson, told him that she was getting it so that they could take care of Coy Smith, and then she gave it to Mr. Carter, David Carter, and David Carter said he had killed someone before and was going to kill Coy Smith. Now, obviously, if Ms. Hiles had refused to testify in the grand jury, or if this had never come about, then we could have used any one of those other statements. Certainly if she... But you didn't use those previous statements at trial. We did not. But their argument, Judge, is she wouldn't have testified in the grand jury but for counsel's advice. Well, that's demonstrably false. Number one, she had... Well, I thought you couldn't use statements made during a proffer unless she got on the stand and then you could use them for impeachment if she testified but I didn't think you could use a proffer statement as affirmative defense. Well, it's according to the terms of the proffer letter and in this proffer letter, Judge, if she was untruthful then any promise of use immunity was null and void. No, untruthful but not silent. Well, she was both. I mean, well, you're setting up the hypothetical that she was what you said was, if she had just gone in front of the grand jury and invoked her Fifth Amendment and says, I'm not saying anything, you could have then put the proffer in. I don't think you could. Well, under the terms of the proffer letter, she had to continue to cooperate and provide information. If she had refused to testify in the grand jury or refused to testify at trial, there's no reason... I'm not sure I agree with that. The terms of the proffer letter would... Because the proffer also talks about further agreements. I mean, there's a lot of things in the proffer that have to be done before you could actually use a proffer statement. The point is, and my initial point, obviously, is that the agreement, their allegation this agreement came about after the grant, only after I pointed out in our opening brief that that would mean there could be no prejudice, did it suddenly become the argument of Ms. Hiles that, in the reply brief, that they were contemporaneous. And now here today, Mr. Goodwin argues that the agreement was before the grand jury which I don't know what he bases that on, if he's basing his argument regarding this supposed second agreement on the pleadings of defense counsel. I'd point out that at the hearing on the motion for specific performance, Mr. Hill, the defense counsel, said it's the position of the defendant that there was an agreement entered into on or shortly before October 24, 2001. The only relevant issues relative to specific performance occur after have to occur after October 24, 2001, and for that reason it's not necessary for there to be an inquiry of statements from defendant prior to that date, and of course that would include the grand jury. That's in the transcript of that hearing at appendix 150. So what that means is the agreement was entered on or shortly before October 24, 2001 that none of petitioner's statements before October 4, 2001 including the October 18 grand jury were relevant, and I would point out again, the petitioner invoked her Fifth Amendment right at this hearing when I asked her about whether she was truthful, cooperative, etc. As late as the 2255 motion in this case which was what the district court decided here. There was no argument before the district court that these were contemporaneous or that the second agreement came before the grand jury testimony. And so they're stuck with that. And in the 2255 motion, and I quote, it's at appendix 23, trial counsel only explained in her testimony to the government agents up to the time prior to the dismissal all charges would be dismissed because of the statements she had provided to the government. At this point, Ms. Hiles had provided information to government agents on numerous occasions. So what that tells us is that counsel's alleged advice regarding the agreement was after not just after, but as a consequence of the prior statements. And that would include the grand jury, and that at this point those are his words, at this point, that is the point that counsel advised Ms. Hiles, she had already provided information on numerous occasions, which again would include the grand jury, which was the only statement admitted against Ms. Hiles at trial. Did the jury get all of the grand jury testimony or just parts? How did it work in this case? Just parts. How many parts? Well, you can break it down into six points. There's a total of fewer than four pages of transcript testimony regarding the grand jury, actual trial transcript. There were six points. Two of those were admitted by defense counsel. As I think you pointed out, Judge Benton, some of it was favorable. That when she bonded out David Carter on August 10 of 2000, after Mr. Carter had the conversation with Tyrese Hiles about killing Coy Smith, she claimed in the grand jury that she didn't know. Now later, we found out that that wasn't true, but defense counsel wanted to put that in, and we put it in. There were six points. Two of those were defense counsel's points. What's the other one that was defense counsel's point of the six? Let's see. I didn't see another one of the six that were favorable. Yeah, there was one other. Oh, it was that the reason that she signed the bond papers was just to be sure. She was told she had to sign to be sure that David Carter would show up for court on his bond. Our point was that she had obviously signed the bond papers. That's kind of a neutral one. They wanted it. We didn't want to offer it. They offered it. Those documents were admitted at trial, right? They were admitted at trial with her signature, and the bondsman came in, recalled that particular transaction, identified Ms. Hiles as the person who had signed it, and indicated that she had told him she just sold the car to David Carter. Again, that's all evidence independent of the grand jury. There's nothing in that grand jury testimony that we did not otherwise prove with other evidence. Also, Judge Molloy, you raised the issue with her failure to cooperate. Obviously, she under either the terms of the proffer letter or under the terms of the second agreement that they alleged, she was required to cooperate and be truthful. And Mr. Goodwin indicated that she was just required, according to previous defense counsel, to sort of show up and answer questions, truthful or not. Seems silly. Well, that's not the case. Ms. Hiles, I was able to get some answers from her, despite her invoking the Fifth Amendment. At Appendix 320, she testified at the second hearing on the motion for specific performance that after this dismissal of the indictment, she was required to continue to tell the truth and fully cooperate with the government. And I went through a litany for about a page and a half with her about her responsibilities, whether it's under the proffer letter or the second agreement. Thank you for your time. Do you have a minute, Mr. Goodwin? Briefly, Your Honors. I believe the discussion today about when exactly the second agreement that did not exist was communicated to Ms. Hiles points out the need for an evidentiary hearing in this case. In his pleading alone, trial counsel indicates that basically after this case was dismissed, which was just a week later, he didn't know if he had to keep his case file open or not for years. If not prior to the grand jury testimony, if it wasn't the motivation for her to testify, when else would trial counsel have reached this agreement, since he only really did anything for another week in the case. So certainly that would be logical that he did it before the grand jury. It could be resolved through the evidentiary hearing. And for those reasons, we would ask the court to reverse the district court. Thank you. Okay, thank you, Mr. Goodwin. Well, thank you both for your arguments, and we will take the case under advisement.